**[ORAL ARGUMENT NOT YET SCHEDULED]**
**Nos. 14-1163, 14-1175**

_____

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**MIKE-SELL'S POTATO CHIP COMPANY,**

*Petitioner and Cross-Respondent,*

**v.**

**NATIONAL LABOR RELATIONS BOARD,**

*Respondent and Cross-Petitioner.*

_____

**ON PETITION FOR REVIEW FROM A DECISION OF THE NATIONAL
LABOR RELATIONS BOARD**

_____

**BRIEF FOR PETITIONER AND CROSS-RESPONDENT**

_____

Jennifer R. Asbrock  (0078157)
THOMPSON HINE LLP
Austin Landing I
10050 Innovation Drive, Suite 400
Dayton, Ohio  45342-4934
Tel. (937) 443-6849
Fax. (937) 443-6635
Jennifer.Asbrock@ThompsonHine.com

*Counsel for Petitioner and Cross-
Respondent, Mike-sell's Potato Chip
Company*

# CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

### A.      Parties And Amici

Petitioner and Cross-Respondent in this case is Mike-sell's Potato Chip Company ("Mike-sells" or "Company").  Respondent and Cross-Petitioner is the National Labor Relations Board ("Board").

### B.      Ruling Under Review

The ruling under review is a Decision and Order ("Order") issued on August 15, 2014, and corrected on September 16, 2014, by the Board, which is reported at 361 NLRB No. 23 (upholding 359 NLRB No. 86).  (JA017; JA007.)  The Order affirms a Decision and Order ("Decision") of Administrative Law Judge Paul Bogas ("ALJ") that the Company violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("NLRA").  (JA008-JA016.)

### C.      Related Cases

This case was previously before this Court styled as *Mike-sell's Potato Chip Company v. NLRB*, Case No. 13-1139, but the case was dismissed when the original Order (i.e., 359 NLRB No. 86) was vacated in accordance with *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014).  When the Board issued its new Order (i.e., 361 NLRB No. 23), Mike-sell's filed a new Petition for Review, which is at issue in the instant case.  Other than Case No. 14-1175 which has been heretofore

consolidated with Case No. 14-1163, Mike-sell's is not aware of any other related cases currently pending in this Court or in any other court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Mike-sell's hereby makes the following disclosures:

Mike-sell's is a privately-held manufacturer and distributor of snack food products. Mike-sell's has no parent corporations, and no publicly held company has a 10% or greater ownership interest in Mike-sell's.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES ......................................................................... i

    A. Parties And Amici ............................................................ i

    B. Ruling Under Review ....................................................... i

    C. Related Cases ................................................................. i

CORPORATE DISCLOSURE STATEMENT ................................. ii

TABLE OF CONTENTS ............................................................ iii

TABLE OF AUTHORITIES ........................................................ v

GLOSSARY ........................................................................ viii

JURISDICTIONAL STATEMENT ............................................... 1

STATUTES AND REGULATIONS .............................................. 1

ISSUE PRESENTED FOR REVIEW ............................................ 1

STATEMENT OF THE CASE .................................................... 2

STATEMENT OF THE FACTS .................................................. 3

    A. Background Facts ............................................................ 3

    B. Circumstances Leading To The 2011 Reopener ....................... 7

    C. The Parties' Pre-Bargaining Communications ........................ 8

    D. The December 12th Informational Meeting ........................... 14

    E. The December 14th Bargaining Session ............................... 16

    F. Post-Bargaining Events ................................................... 18

SUMMARY OF THE ARGUMENT ............................................ 19

STANDING ......................................................................... 21

STANDARD OF REVIEW ...................................................................22

ARGUMENT ......................................................................................22

I.      The ALJ Erred In Failing To Consider Several Important Aspects Of
        The Parties' Bargaining History And Practices. ...........................25

        A. The Parties' Contentious Relationship And Bargaining History
           Explain Each Party's Actions During The 2011 Reopener.....................25

        B. The Parties' Practice Of Not Entering Written Agreements On
           Mid-Term Bargaining Issues Demonstrates Why They Did Not Put
           The 2011 Reopener Agreement In Writing..............................................26

        C. The Results Of The 2008 Reopener Reveal The Motive For The
           Union's Delay Tactics During The 2011 Reopener. ................................28

        D. The December 12th Informational Meeting Reveals Important
           Discrepancies In The Union's Testimony. .................................32

        E. The Union's Demand To Bargain Outside The Contractual
           Timelines Demonstrates That Both Parties Had The Obligation To
           Push The Contractual Reopener Process Forward. ...................33

II.     The ALJ Abused His Discretion In Making Credibility
        Determinations..........................................................................35

        A. The Union's Inconsistent Testimony Demonstrates That Its
           Position Is Unworthy Of Credence. ........................................35

        B. Ms. Wille's Demeanor And Testimony Were Consistent With The
           Evidence Of The Parties' Bargaining History And Practices. .................37

CONCLUSION ..................................................................................43

CERTIFICATE OF COMPLIANCE....................................................45

CERTIFICATE OF SERVICE ............................................................46

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Court Cases

*Eastern Omni Constructors, Inc. v. NLRB,*
    170 F.3d 418 (4th Cir. 1999) ...........................................................22

*Krispy Kreme Doughnut Corp. v. NLRB,*
    732 F.2d 1288 (6th Cir. 1984) ..........................................................24

*Lord & Taylor v. NLRB,*
    703 F.2d 163 (5th Cir. 1983) ...........................................................23

*Medline Industries, Inc. v. NLRB,*
    593 F.2d 788 (7th Cir. 1979) ...........................................................24

*NLRB v. Cutting, Inc.,*
    701 F.2d 659 (7th Cir. 1983) ...........................................................24

*NLRB v. Noel Canning,*
    134 S. Ct. 2550 (2014)......................................................................i

*Sutter E. Bay Hosps. v. NLRB,*
    687 F.3d 424 (D.C. Cir. 2012)..........................................................23

*Thomas v. NLRB,*
    213 F.3d 651 (D.C. Cir. 2000)..........................................................22

*TruServ Corp. v. NLRB,*
    254 F.3d 1105 (D.C. Cir. 2001)........................................................22

*TRW, Inc. v. NLRB,*
    654 F.2d 307 (5th Cir. 1981) ...........................................................22

## Board Cases

*International Brotherhood of Electrical Workers, Local Union*
    *No. 22,* 268 NLRB 760 (1984) ........................................................27

*Kasser Distiller Products,*
    307 NLRB 899 (1992) ......................................................................26

*Mike-sell's Potato Chip Company v. NLRB*,
    Case No. 13-1139 ...............................................................................i, 44

*In re Permaneer Corporation*,
    214 NLRB 367 (1974) ..................................................................23

*Safeway Steel Products*,
    333 NLRB 394 (2001) ..................................................................26

*In re Skippy Enterprises, Inc.*,
    211 NLRB 222 (1974) ..................................................................37

## **Arbitration  Cases**

*Baldwin-Whitehall School District*,
    129 LA 899 (Kobell, March 21, 2011) ...........................................28

*Township of Robinson*,
    109 LA 995 (Dean, Jr., October 6, 1997) ........................................28

## **Statutes**

29 U.S.C. § 158 (Sections 8(a)(1) and 8(a)(5) of the NLRA) ......... i, 1, 2, 19, 21, 26

29 U.S.C. § 160(f) ...............................................................................1

## **Other Authorities**

Elkouri & Elkouri, *How Arbitration Works* § 12.7 (6th Ed. 2003) .........................28

Federal Rule of Appellate Procedure 15(a) .............................................1

Federal Rule of Appellate Procedure 32(a)(5).......................................45

Federal Rule of Appellate Procedure 32(a)(6).......................................45

Federal Rule of Appellate Procedure 32(a)(7)(B) ...................................45

Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) .............................45

Federal Rule of Evidence 803................................................................38

D.C. Circuit Rule 25 ...........................................................................47

D.C. Circuit Rule 28(a)(7) ...................................................................21

D.C. Circuit Rule 31 ............................................................................47

D.C. Circuit Rule 32 ............................................................................45

\* No authorities were chiefly relied upon.

# GLOSSARY

ALJ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Administrative Law Judge

NLRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . National Labor Relations Act

## JURISDICTIONAL STATEMENT

Mike-sell's timely filed its Petition for Review on August 29, 2014, to appeal the Order, reported at 361 NLRB No. 23, issued by the Board on August 15, 2014, and corrected on September 16, 2014, in Board Case No. 09-CA-072637. (JA017-JA019.)   The Order was a final agency action that affirmed the ALJ Decision issued on July 3, 2012, that the Company violated 29 U.S.C. § 158, Sections 8(a)(1) and 8(a)(5) of the NLRA.  (JA008-JA016.)   The United States Court of Appeals for the District of Columbia Circuit has jurisdiction over the Company's appeal pursuant to 29 U.S.C. § 160(f) and Rule 15(a) of the Federal Appellate Rules of Procedure.

## STATUTES AND REGULATIONS

All applicable statutory provisions are contained in the addendum to this Principal Brief.

## ISSUE PRESENTED FOR REVIEW

Mike-sell's respectfully submits that the following issue is presented for review:  Whether the Board erred by issuing an Order affirming the Decision of the ALJ issued on July 3, 2012, that Mike-sell's violated Sections 8(a)(1) and 8(a)(5) of the NLRA "when on January 1, 2012, it implemented changes to the contractual health and welfare benefits for employees represented by the B&C Union without following the procedures set forth in the contractual reopening clause and without the Union's consent."

## STATEMENT OF THE CASE

On January 17, 2012, the Union filed an unfair labor practice charge, Charge No. 09-CA-072637.  (JA020.)   The Charge alleged that Mike-sell's violated Sections 8(a)(1) and 8(a)(5) of the NLRA on January 1, 2012, by unilaterally implementing a change in the health and welfare benefits and failing to follow the contractual reopener process.  (JA020.)

On March 20, 2012, the Board filed a Complaint alleging that the Company violated Sections 8(a)(1) and 8(a)(5) of the NLRA on January 1, 2012, by unilaterally changing health and welfare benefits without following the contractual procedure and without consent from the Union.  (JA022.)  The Company denied these allegations (JA031), and a trial was held on May 1, 2012, in front of the ALJ.

On July 3, 2012, the ALJ issued his Decision holding that Mike-sell's implemented changes to the contractual health and welfare benefits for employees represented by the Union without following the procedures set forth in the contractual reopening clause and without the Union's consent.  (JA008.)  The Company timely filed exceptions to this Decision before the Board, contending that the parties had reached an agreement to change the health and welfare benefits in accordance with the contractual reopener procedure.

On August 15, 2014, the Board issued its Order upholding the ALJ's Decision that the Company had made unlawful unilateral changes to the Union's

- 2 -

health and welfare benefits.  (JA017.)  The Board's Order led Mike-sell's to file a

Petition for Review on August 29, 2014.

The Board subsequently issued Corrections to its August 15th Order on

September 16, 2014.  (JA019.)  These Corrections do not change the substance of

the Order or the Company's Petition for Review.

## STATEMENT OF THE FACTS

### A.     Background Facts

Mike-sell's is a privately-held manufacturer and distributor of snack foods

and is headquartered in Dayton, Ohio.  (JA008-009; JA239.)  Mike-sell's Dayton

production and maintenance employees are represented by the Bakery,

Confectionary, Tobacco Workers and Grain Millers International Union, Local 57,

AFL-CIO-CLC ("Union"), and their employment is governed by a Labor Agreement,

executed on November 15, 2010, but effective August 5, 2010, through August 5,

2014.   (JA009; JA240; JA036, JA054.)   The Labor Agreement required the

Company to maintain existing health and welfare benefits for one year from the

Agreement's execution date, after which either party could serve a written request

to reopen negotiations for all health and welfare benefits.  (JA009; JA147; JA053.)

More specifically, the Labor Agreement states as follows:

> Section 11.7 (Reopening Clause) – The company and union hereby
> agree that all health and welfare benefits defined in this agreement in
> article 11 shall remain in full force for one (1) year from the
> execution of this agreement.  After one year, either the company or

the union shall have the right to reopen this agreement and to redefine all health and welfare benefits by simply serving the other party with a written notice of its intention to reopen negotiations concerning all health and welfare benefits. *Within ten (10) days after sending of said notice, the company and union shall begin negotiations for health and welfare benefits. If the company and the union are unable to agree within ten (10) days after beginning negotiations* for health and welfare benefits as to the health and welfare benefits, then, *the matter shall be referred to Federal Mediation for resolution. If a resolution is not reached through Federal Mediation within ten (10) days after referral, then company and union agree the matter shall be submitted to binding arbitration. The binding arbitration shall be held and completed within thirty (30) days after the request of either party for binding arbitration*.

(JA009; JA243-JA244; JA053 (emphasis added).)

The parties had a history of contentious negotiations and "loud and boisterous disagreements." (JA245-JA246, JA274.) In the past, it had always been blatantly obvious when the parties disagreed on a particular issue, as they bickered back and forth until the matter was resolved. (JA245-JA246, JA274.) This contentious relationship held true both in regular bargaining and mid-term bargaining situations for at least six years prior to the hearing in this case.[1] (JA246.)

---

[1] The ALJ, in his Decision, paid no attention to the history of the parties' relationship, which provides important context and background for understanding the importance of the parties' communications before, during, and after the December 14, 2011, bargaining session.

- 4 -

When the parties have engaged in regular bargaining for a successor agreement, they follow a traditional practice of placing tentative agreements in writing and having Union members vote to ratify them. (*See, e.g.,* JA170-JA175, JA292-JA294; JA089; JA090; JA092; JA093.) However, the Labor Agreement does ***not*** have an integration clause, and when the parties have engaged in ***mid-term*** bargaining over a discrete subject, they do ***not*** have a practice of reducing their agreements to writing or putting their agreements to a vote by the Union membership. (JA274, JA278; *see generally* JA036.) In fact, there are several agreements in place between the Union and the Company that were bargained mid-term, that are not in writing, and that directly contradict substantive provisions of the Labor Agreement.[2] (JA278, JA284-JA291.) Most recently, after the current Labor Agreement was negotiated and signed, the parties engaged in mid-term bargaining and later agreed that Maintenance Mechanics would be paid fifty cents more per hour than the signed Labor Agreement actually provides. (JA222-JA225,

---

[2] For example, the Labor Agreement requires the peelers / packers to remain in the peeler room because they are least senior, but the Company entered an unwritten agreement with the Union (in response to the Union's specific request during mid-term bargaining) that allows the peelers / packers to move to the front line. (JA285-JA287; JA047.) The Labor Agreement also requires employees to take their vacation in week-long increments, but the Union negotiated an unwritten, mid-term agreement with the Company to allow employees to take vacation one day at a time. (JA045-JA046; JA288-JA290.) The Labor Agreement also requires three days' notice of a foreseeable absence, but the Company has agreed (in response to a specific proposal from the Union) not to enforce this contractual notice requirement. (JA290-JA291; JA051.)

JA278-JA283; JA137.)   The parties never put this mid-term agreement into writing, but the additional fifty cents per hour was verbally agreed to and has been continuously paid since January 2011.[3]  (JA225-JA226, JA279, JA284.)

The Labor Agreement's insurance reopener provision has been in place for some time, and the current dispute is not the only time that the parties have reopened negotiations for health and welfare benefits.  (JA009; JA244.)   The parties previously reopened negotiations for health and welfare benefits under the predecessor contract in 2008, so the Union is intimately familiar with the reopener process and the contractual timelines.   (JA009, JA011; JA183-JA185, JA217-JA218, JA244.)  It was clear that the parties could not come to an agreement on the health and welfare changes Mike-sell's proposed in 2008, so the parties followed the contractual process all the way through arbitration.  (JA009-JA011; JA183, JA244-JA246.)   The Company prevailed at arbitration, and the changes were implemented.[4]  (JA009-JA011; JA244-JA245.)   No new written agreement was executed to reflect the 2008 changes.  (JA183, JA244-JA245.)

---

[3] In his Decision, the ALJ discounts the importance of the parties' longstanding mid-term bargaining practices, which have occurred repeatedly over the course of many years. (JA012.)

[4] In 2008, however, the Union delayed negotiations, mediation, and arbitration in order to stretch the entire reopener over more than a year, long after the contractual process should have ended. (JA009, JA011; JA244.)  Mike-sell's was determined not to allow this sort of delay to occur again.

### B.    Circumstances Leading To The 2011 Reopener

Mike-sell's provides a self-insured, high-deductible health and welfare plan for its employees, which includes a Health Savings Account ("HSA") partially funded by the Company.  (JA009; JA241.)  All of these health and welfare benefits are administered by Anthem Blue Cross / Blue Shield.  (JA009.)  Although Mike-sell's gets quotes from outside companies every year, the Company has consistently found that outside quotes cannot compete economically with its own self-insurance.  (JA242.)  Prior to January 1, 2012, the Company's health and welfare plan had remained unchanged for four years.  (JA243.)  Despite sky-rocketing healthcare costs, Mike-sell's tried not to pass these increased costs to employees.

By 2011, Mike-sell's could no longer afford to continue the existing health and welfare benefits.  (JA246-JA247.)  The cost of these benefits in 2011 had increased about 43% (i.e., $500,000) over the cost in 2010.  (JA246; JA065; JA118.)  As for the Union standing alone, the total cost of claims for bargaining unit members in 2011 had increased almost $150,000 from the total cost of claims in 2010.  (JA247.)  At the same time that healthcare costs were skyrocketing, Mike-sell's business was losing significant amounts of money due to the competitive environment in which it operates.  (JA246-JA247.)  Under these

circumstances, Mike-sell's was forced to take immediate action to mitigate these increased healthcare costs.[5]  (JA246-JA247.)

The Company's goal was to find an affordable solution to its healthcare dilemma that would adversely affect as few employees as possible.  (JA247-JA248, JA250.)  Mike-sell's considered a dozen different plans.  (JA249-JA250.)  After weighing its options, Mike-sell's ultimately decided (1) to reduce contributions to HSAs from $500 (single) / $1,000 (family) to $250 (single) / $500 (family); and (2) to require employees to pay 20% co-insurance after meeting their deductible (which remained the same), up to an out-of-pocket maximum of $4,000 (single) / $8,000 (family).[6]  (JA009; JA241, JA248-JA249.)  Even with these changes, the Company's savings were only about $220,000, which was $30,000 less than the Company had anticipated.  (JA247, JA249-JA250.)

### C.  The Parties' Pre-Bargaining Communications

On November 8, 2011, Mike-sell's served a written request to reopen negotiations for health and welfare benefits in accordance with Section 11.7 of the Labor Agreement and suggested four potential bargaining dates.  (JA009; JA147-

---

[5] During the 2008 reopener, the Union had already independently attempted to find a more affordable healthcare plan, but the Union had been unable to find an insurance company that was even willing to provide a quote due to the small number of employees in the bargaining unit and the large number of claims and pre-existing and/or chronic conditions.  (JA266.)

[6] Under the pre-2012 plan, everything was paid at 100% after the deductible. (JA009; JA241.)

JA148, JA251-JA254; JA053; JA062; JA115.)   The Union replied in writing on November 10, 2011, stating that the Union would "prepare to honor [the Company's] request to redefine the health and welfare [benefits]" upon receiving "a reason for reopening [the Labor Agreement] to redefine all health and welfare benefits."  (JA010; JA148-JA149, JA254; JA063; JA116.)   The Union did not respond to the Company's request for potential bargaining dates.[7]  (JA063; JA116.)

Mike-sell's twice responded to the Union's inquiry about the reason for reopening health and welfare benefits, although it had no obligation to do so in order to start the reopener timeclock.[8]  (JA149-JA151, JA254-JA255; JA064-JA065; JA117-JA118.)   On November 11, 2011, Mike-sell's explained that the Company simply wanted to exercise its contractual right to reopen negotiations on the subject of health and welfare benefits, which required only a written notice of an intent to reopen.  (JA254; JA064; JA117.)   The Union did not respond to the Company's November 11th letter.  (JA150, JA254-JA255.)   On November 15, 2011, Mike-sell's further explained that the reopener was being requested "due to

---

[7] Beyond referencing the first communication from each side, the ALJ pays little heed to the "flurry of correspondence" between the parties.  (JA010.)  However, the substance and tenor of these communications are critical in determining each party's intentions before, during, and after the reopener.

[8] The Labor Agreement provides that "either the company or the union shall have the right to reopen this agreement and to redefine all health and welfare benefits *by simply serving the other party with a written notice of its intention to reopen negotiations* concerning all health and welfare benefits."  (JA053 (emphasis added)).

- 9 -

rising costs" and cited specific cost increases from 2010 to 2011.  (JA255; JA065; JA118.)  The Company reiterated its request for potential bargaining dates in both of these letters.  (JA255; JA064; JA065; JA115, at JA117-JA118.)

On November 16, 2011, the Union offered to begin negotiations for the health and welfare benefits reopener on November 29th at the Union's office in Columbus, Ohio.  (JA151-JA152, JA255-JA256; JA066; JA115, at JA119.)  Mike-sell's responded to the Union that same day, explaining that November 29th was unacceptable to *begin* bargaining because it would delay the start of negotiations more than ten days after Mike-sell's served the reopener request on November 8th, which would not comport with the Labor Agreement's requirement to begin negotiations "[w]ithin ten days after sending of [the Company's] notice."  (JA152-JA153, JA185, JA256; JA067; JA115, at JA120.)  Mike-sell's further explained that if the Union failed to commence bargaining within the Labor Agreement's ten-day window, then the Company would proceed to the next step in the Labor Agreement by requesting a mediator.[9]  (JA067; JA115, at JA120.)  Mike-sell's heard nothing back from the Union.

On November 18, 2011, Mike-sell's requested a mediator, scheduled mediation for November 29th (i.e., the specific date offered by the Union as being

---

[9] During the 2011 reopener process, Mike-sell's remained mindful of the Union's delay tactics during the 2008 reopener process; the Company was determined  not to let that happen again.  As later events demonstrate, the Union did everything it could to again stall the process.

available), and notified the Union of the scheduled mediation. (JA153, JA257-
JA258, JA261; JA068; JA115, at JA121.) The Union replied on November 20,
2011, indicating that its Business Agent had "scheduled meetings in other locations
on [November 29th]" and demanding that any meetings take place at the Union's
office in Columbus, Ohio. (JA153-JA154, JA259; JA069; JA115, at JA122.) The
Union also claimed that Mike-sell's had not yet responded to its information
request. (JA069; JA115, at JA122.)

Mike-sell's replied via email on November 23, 2011, explaining that it was
unreasonable for the mediation to take place at the Union's office in Columbus,
Ohio, because everyone who would be involved in the mediation (i.e., the
mediator, the Company representatives, the Union membership, and the Union
Steward) is located in Dayton, Ohio, except for the Union's Business Agent.[10]
(JA154-JA155, JA258-JA260; JA070; JA115, at JA123.) The email further
explained that, if the Union refused to participate in the mediation on the very date
that it had suggested as being available, the Company would proceed to binding
arbitration in accordance with the Labor Agreement's reopener timeline. (JA260;
JA070; JA115, at JA124.) Finally, Mike-sell's reminded the Union that it had
already responded to its information request in prior correspondence dated

---

[10] This request was also contrary to the bargaining practices of the parties, as
negotiations had **always** taken place in Dayton, Ohio. (JA189, JA259.)
Negotiations had **never** taken place in Columbus, Ohio. (JA189, JA258.)

November 11th and November 15th.  (JA070; JA115, at JA124; *see also* JA064; JA065, JA115, at JA117-JA118.)

On November 27, 2011, the Union stated via email that it would be unavailable on November 29th for the scheduled mediation.  (JA115-JA156, JA260-JA261; JA071; JA115, at JA125.)  The Union insinuated that the reason for its unavailability stemmed from the fact that Mike-sell's had rejected November 29th as the date to begin negotiations.  (JA071; JA115, at JA125.)  The Union also submitted a new, more detailed request for information, demanding a response by December 1, 2011.  (JA156, JA261; JA071; JA115, at JA125.)  On November 28, 2011, Mike-sell's sent two emails responding to the Union's new information request and explaining that the mediation would proceed as scheduled.  (JA156-JA157, JA261-JA262; JA072; JA073; JA115, at JA126-JA127.)

The Union failed to attend the mediation on November 29th.  (JA189, JA262.)  Mike-sell's therefore informed the Union that the Company would invoke the Labor Agreement's binding arbitration clause.  (JA158, JA262; JA104; JA115, at JA128.)  The Company asked the Union whether it had a preference between the only two arbitrators known to be available to hear the case within the thirty-day timeframe established by the Labor Agreement.  (JA158, JA262; JA104; JA115, at JA128; *see also* JA036, at JA053.)

- 12 -

On November 30, 2011, the Union emailed Mike-sell's and claimed that, because "no negotiations [had] taken place" and the parties "[had] not met with a Federal Mediator," there was "nothing to submit to arbitration." (JA159, JA263; JA075; JA115, at JA129.)   The Union then requested that Mike-sell's explain "how the Company propose[d] to redefine health and welfare benefits, so that the process of negotiations [could] be commenced." (JA075; JA115, at JA129.) Finally, the Union rejected the two arbitrators suggested by the Company and stated that, if arbitration became necessary, the parties should request a panel from the Federal Mediation and Conciliation Service ("FMCS"). (JA263; JA075; JA115, at JA129.)

On December 2, 2011, Mike-sell's responded to the Union, explaining the specific changes that the Company had been requesting to bargain over. (JA076, at JA080-JA081; JA115, at JA131-JA132.)   Mike-sell's further referenced its many attempts to bargain, mediate, and arbitrate the health and welfare benefits within the time limits set by the Labor Agreement. (JA076, at JA081; JA115, at JA131-JA132.)  Last, the Company explained that, per the Union's request, an expedited panel had been referred by FMCS so that the parties could engage in the normal arbitrator selection process. (JA263; JA076, at JA081; JA115, at JA132.)   The Company confirmed that it remained open to bargaining with the Union in the interim, pending arbitration. (JA076, at JA081; JA115, at JA132.)

The Union replied on December 2, 2011, refusing to engage in the arbitrator selection process and claiming for the first time that the Company's notice to reopen negotiations was "void" because it was served seven days prior to the one-year anniversary of the Labor Agreement's execution date.  (JA007; ALJD, p. 4; JA160; JA076, pat JA079-JA080; JA115, at JA130-JA131.)   On December 6, 2011, Mike-sell's sent an email acknowledging this technical flaw but explaining that its requests to reopen the health and welfare benefits provision had continued throughout November 2011, ***including a request to negotiate that was sent on November 15, 2011***, exactly one year after the Labor Agreement was executed. (JA264; JA076, at JA078-JA079; JA115, at JA129-JA130; *see also* JA065; JA115, at JA118.)  Nonetheless, the Company once again invited the Union to negotiate over the next ten days.  (JA007; ALJD, p. 4; JA264; JA076, at JA078-JA079; JA082; JA115, at JA129.)  The Union agreed to meet and bargain with Mike-sell's at the Company's facility on December 14, 2011.  (JA007; ALJD, p. 4; JA161, JA264-JA265; JA076, at JA077-JA078; JA082; JA115, at JA129.)

### D.    The December 12th Informational Meeting

In early December, before the parties' bargaining session, Mike-sell's held informational sessions for all employees to explain the proposed health and welfare changes.  (JA204-JA207, JA231-JA232, JA251, JA299.)   These changes were already "set in stone" for nonunion personnel, as well as for the employees in other

bargaining units with whom Mike-sell's had no obligation to negotiate.  (JA007; ALJD, p. 4.)  On December 12, 2011, Mike-sell's held a separate informational meeting for the Union and explained that the Company had an obligation to meet and bargain with the Union over the proposed changes.[11]  (JA007; ALJD, p. 4; JA207, JA219, JA251, JA301, JA303.)  Although Mike-sell's understood that the adoption of the proposed changes would be dependent on the outcome of bargaining (JA250-JA251, JA312), the Company nonetheless felt that it would be beneficial for Union members to attend the same informational meeting as other employees so that they received the same information and notice of the changes that the Company was hoping to put into effect on January 1, 2012.  (JA250-JA251, JA306.)  It gave Union members—including the Union Steward—the opportunity to ask any questions about the proposed changes directly to the insurance representative.  (JA202, JA204-JA205, JA207, JA306.)  It is undisputed that none of the Union members asked any questions or raised any concerns or

---

[11] The ALJ discounts the importance of this meeting, finding it "unnecessary to resolve [the] credibility question" raised by the parties' differing testimony. (JA007; ALJD, p. 4.)  By ignoring this meeting, the ALJ effectively excludes inconsistencies in the testimony between Union witnesses, as well as important facts that shed light on the Union's motives during the reopener process.

objections to the proposed changes at the informational meeting.[12] (JA007; ALJD, p. 4; JA207, JA219, JA234.)

### E.    The December 14th Bargaining Session

The December 14th bargaining session was attended by Sharon Wille ("Wille"), the Company's Human Resources Director, Steve Campbell ("Campbell"), the Union Steward, and Vester Newsome ("Newsome"), the Union's Business Agent. (JA007; ALJD, p. 4; JA162, JA208.) Ms. Wille had blocked off the entire day for negotiations because she figured it would take at least that long to come to some agreement. (JA265.) But, to the Company's surprise, the bargaining session was short, sweet, and non-confrontational, lasting only about 15 or 20 minutes. (JA162, JA266, JA267, JA273; JA143.)

The Union presented no written proposals. (JA191.) Mr. Newsome simply asked what changes Mike-sell's wanted to make and why, and Ms. Wille explained the rising costs that led to the specific health and welfare benefit proposals. (JA162-JA163, JA266.) Mr. Newsome stated that the changes would affect

---

[12] The ALJ, in his Decision, states that "the insurance broker provided employees with informational packets that had not been shared with the Union," seemingly insinuating that the Company was trying to hide substantive information from the Union. (JA007; ALJD, p. 4.) While the Union had not previously received a copy of the informational packet, that was simply because the Union had delayed the start of negotiations beyond the date of the informational meeting. In any case, it is undisputed that the Union Steward, Steve Campbell, attended the December 12th informational meeting and thus received an informational packet before the December 14th bargaining session. (JA007; ALJD, p. 4; JA202, JA204-JA205.)

- 16 -

bargaining unit members, and Ms. Wille emphasized that all employees would be equally affected. (JA267.) Mr. Newsome inquired whether Mike-sell's had considered outside insurance carriers rather than remaining self-funded, but he admitted that the Union's past attempts to find outside insurance had failed—and would fail again—due to the small number of employees in the group and the large number of claims and pre-existing and/or chronic conditions. (JA266.) Mr. Newsome asked whether it was possible for Mike-sell's to hold off on the changes for a few months, but Ms. Wille assured him that the costs were only expected to rise in the coming year, as employees' conditions and claims persisted. (JA163-JA164, JA266-JA268.) Mr. Newsome asked whether the reduced HSA contributions and the increased co-insurance were the only proposed changes to health and welfare benefits, and Ms. Wille confirmed that there were no further changes proposed for 2012 but that additional changes may be proposed in future years. (JA267.) Mr. Newsome then stated that Mike-sell's had "the right to make the changes," so Ms. Wille informed Mr. Newsome that the Company planned to implement the changes on January 1, 2012.[13] (JA267-JA268, JA273-JA274.) The

---

[13] Ms. Wille ultimately suspected that, had the matter proceeded to arbitration, an arbitrator would have found the Company's proposed changes to be reasonable under the circumstances, just as in 2008. Thus, she interpreted Mr. Newsome's comment to relate to the likelihood that—if push had come to shove—an arbitrator would find that Mike-sell's had the right to implement the changes and that the Union would prefer to consent to the changes in bargaining rather than wasting money to ultimately lose again at arbitration. (JA307-JA308.)

parties then left the bargaining table and shook hands, and Ms. Wille handed Mr. Newsome a box of holiday chocolates on his way out the door.  (JA267.) Although Ms. Wille took notes during the bargaining session, the parties did not put anything in writing to memorialize their agreement, as that was not their customary mid-term bargaining practice.  (JA143; JA222-JA226, JA274.)

### F.    Post-Bargaining Events

Mike-sell's received no further communication from the Union.  (JA191, JA213, JA221, JA274-JA276.)  Based on the parties' communications during the December 14th bargaining session, as well as the Union's failure to reject the proposed changes or request additional bargaining sessions within the contractual ten-day period ending December 24th,[14] Mike-sell's understood the parties to have reached an agreement that the proposed changes to health and welfare benefits were acceptable.  (JA221, JA274-JA275, JA277-JA278, JA311.)  The Company thus implemented the proposed health and welfare benefit changes on January 1, 2012, just as Ms. Wille had announced would be done at the conclusion of the December 14th bargaining session.  (JA220, JA222, JA267-JA268.)

On January 13, 2012, the Union claimed that no agreement had been reached regarding the proposed health and welfare benefit changes and suddenly demanded that the matter proceed to mediation because the parties "were unable to agree . . .

---

[14] Not only did the Union fail to request another bargaining session, but it also failed to seek a referral to mediation or arbitration.  (JA194-JA195, JA221.)

- 18 -

within the ten day time limit." (JA178-JA179, JA276; JA095, JA115, at JA133.)
The Union further demanded that the Company reinstate the former health and
welfare benefits. (JA095, JA115, at JA133.) Ms. Wille was "absolutely stunned."
(JA007; ALJD, p. 5; JA276.) Mike-sell's declined to reinstate the former benefits
because both parties had ultimately agreed that the proposed changes were
acceptable and would be implemented on January 1, 2012. (JA179, JA277-JA278;
JA096; JA115, at JA134.) The Union thereafter filed the instant unfair labor
practice charge and prompted two more rounds of correspondence regarding the
dispute, wherein both parties maintained their respective positions. (JA020;
JA181-JA182, JA277-JA278; JA097; JA098; JA108; JA114, JA115, at JA135-
JA136.)

## SUMMARY OF THE ARGUMENT

The Board erred by affirming the ALJ's Decision that Mike-sell's violated
Sections 8(a)(1) and 8(a)(5) of the NLRA "when on January 1, 2012, it
implemented changes to the contractual health and welfare benefits for employees
represented by the B&C Union without following the procedures set forth in the
contractual reopening clause and without the Union's consent."

The ALJ failed to consider the parties' bargaining history and practices,
which shed important light on each party's motives and intentions during the 2011
reopener. For example, the ALJ ignored the parties' contentious relationship, the

parties' history of unwritten midterm agreements, the parties' 2008 reopener, the Union's 2011 delay tactics, the Company's December 12th informational meeting, and the Union's belated actions to push the contractual process forward. Recognition of these factors would have resulted in a finding that the parties indeed reached an Agreement on the December 14th bargaining session.

The ALJ also abused his discretion in making credibility assessments that were unsupported by substantial evidence in the record as a whole. The record reveals numerous inconsistencies between the vague testimony of three Union witnesses, and these inconsistencies were never reconciled by the ALJ. In contrast, Ms. Wille's testimony was detailed, steadfast, and consistent with the other evidence in the record.

There is simply no support in the record for finding the Union witnesses more credible than Ms. Wille. This is not a case that involves credibility assessments based on detailed demeanor assessments at the hearing, such as where the ALJ's Decision was based on his observation of physical, verbal, and non-verbal cues, gestures, and testimony. For example, there is no discussion of Ms. Wille giving evasive answers, making poor eye contact, becoming easily rattled, or other tell-tale signs of incredibility. Rather, this is a case where the ALJ made credibility assessments based primarily on his own subjective opinion of what each party was more likely to do in a given situation. Unlike demeanor assessments,

- 20 -

which only the ALJ observes, the ALJ is in no better position to speculate about the parties' respective actions than a reviewing court. Thus, the ALJ's credibility assessments are not deserving of the high level of deference normally given in administrative appeals.

When all of the relevant evidence is properly considered, it is clear that the record as a whole does ***not*** contain substantial evidence to support the ALJ's credibility assessments, factual findings, conclusions of law, remedy, and order. Accordingly, the Company's Petition for Review should be granted, the General Counsel's Petition for Enforcement should be denied, and the Board's Order should be reversed.

## STANDING

Pursuant to Local Circuit Rule 28(a)(7), Mike-sell's has standing to file this appeal by virtue of the fact that it was named as the Respondent in an unfair labor practice charge filed by the Union. (JA020-JA021.) The Union's charge alleged that the Company violated Sections 8(a)(1) and 8(a)(5) of the NLRA. (JA021.) On August 15, 2014, the Board issued an Order (which was corrected on September 16, 2014, and September 24, 2014) reported at 361 NLRB No. 23 in Board Case No. 09-CA-072637, upholding the ALJ Decision issued on July 3, 2012 (originally reported at 359 NLRB No. 86). (JA007.) The Company is directly and adversely affected by the Board's Order, which requires monetary and

- 21 -

injunctive relief.  Accordingly, the Company has standing to seek review of the Order.

## STANDARD OF REVIEW

The Board's Order cannot be upheld and enforced unless substantial evidence in the record as a whole supports its factual findings and its conclusions have a reasonable basis in the law.  *See, e.g., TruServ Corp. v. NLRB,* 254 F.3d 1105, 1115 (D.C. Cir. July 6, 2001).  In undertaking a substantial evidence review, the Court must consider "not just the evidence that supports the Board's decision, but any evidence in the record that 'fairly detracts from its weight.'"  *See, e.g., Thomas v. NLRB,* 213 F.3d 651, 657 (D.C. Cir. 2000) (internal citations omitted).  When reviewing the Board's findings as to an employer's motivations, "an unlawful purpose is not to be lightly inferred," as federal courts have recognized that mere "[s]uspicion, conjecture, and theoretical speculation register no weight on the substantial evidence scale."  *TRW, Inc. v. NLRB*, 654 F.2d 307, 312 (5th Cir. 1981); *see also Eastern Omni Constructors, Inc. v. NLRB*, 170 F.3d 418, 427 (4th Cir. 1999).  Thus, the Board's Order cannot stand unless it is supported by objective evidence in the record that substantially confirms the Board's findings.

## ARGUMENT

This case turns on whether the parties reached an agreement at the December 14th bargaining session.  In answering this question, the ALJ was

required to consider all of the facts in the record and all of the testimony. The ALJ repeatedly concluded that Ms. Wille's testimony was "implausible" based on his own subjective evaluation of the relative likelihood of her account. (JA007; ALJD, pp. 5-6.) Regarding the disputed aspects of the December 14th bargaining session, the ALJ decided to credit the Union's witnesses over the Company's witness, purportedly "[b]ased on [his] consideration of the demeanor and testimony of the witnesses and the record as a whole." (JA007; ALJD, p. 5.)

However, it is well established that "[a]n Administrative Law Judge cannot simply ignore relevant evidence bearing on credibility and expect the Board to rubber stamp his resolutions by uttering the magic word 'demeanor.'" *See, e.g., In re Permaneer Corporation*, 214 NLRB 367, 369 (1974). In fact, "a decision which ignores a portion of the record is [not] supported by substantial evidence." *Lord & Taylor v. NLRB*, 703 F.2d 163, 169 (5th Cir. 1983). "Although an ALJ's credibility determinations are entitled to significant deference, . . . they are not immune to judicial scrutiny." *Sutter E. Bay Hosps. v. NLRB*, 687 F.3d 424, 438 (D.C. Cir. July 24, 2012). Accordingly, "[a] reviewing court does not act, even in credibility matters, as a mere rubber stamp for the administrative agency action on appeal." *Krispy Kreme Doughnut Corp. v. NLRB*, 732 F.2d 1288, 1290 (6th Cir. April 27, 1984); *see also Medline Industries, Inc. v. NLRB*, 593 F.2d 788, 795-96

- 23 -

(7th Cir. 1979) ("inferences contrary to direct testimony are not ordinarily sufficient to support a finding [by an ALJ]").

In several instances, the ALJ took testimony out of context and/or failed to consider other evidence that conflicted with his conclusions.  This kind of "selective analysis" is improper, especially where the inferences drawn from ignoring certain evidence are contrary to direct, unrebutted testimony.  *See, e.g., NLRB v. Cutting, Inc.,* 701 F.2d 659, 665-69 (7th Cir. 1983).  Here, the evidence that was ignored by the ALJ is the same critical evidence that reveals the truth in this case:  Mike-sell's had ***nothing to gain*** by fabricating an agreement between the parties and suddenly ignoring the reopener process that the Company had previously pursued so diligently in accordance with contractual timelines.

Based on the following considerations, which are explained below in further detail, the Company's Petition for Review should be granted, the General Counsel's Petition for Enforcement should be denied, and the Board's Order should be reversed because:  (I) the ALJ erred in failing to consider several important aspects of the parties' bargaining history and practices; and (II) the ALJ abused his discretion in making credibility determinations.  As a result, the record as a whole does not contain substantial evidence to support the ALJ's credibility assessments, factual findings, conclusions of law, remedy, and order.

## I.    The ALJ Erred In Failing To Consider Several Important Aspects Of The Parties' Bargaining History And Practices.

### A.    The Parties' Contentious Relationship And Bargaining History Explain Each Party's Actions During The 2011 Reopener.

Ms. Wille presented undisputed evidence that the parties had a strained relationship and a contentious bargaining history, full of "loud and boisterous disagreements." (JA245-JA246, JA274.) Ms. Wille expected the 2011 reopener to follow this same pattern, with the parties arguing all day long at the bargaining table and leaving frustrated with one another; she did *not* expect to reach an agreement. (JA265.) Ms. Wille was prepared to advance the reopener process, as evidenced by the fact that she had already lined up a mediator *and* an expedited arbitration panel. (JA153, JA257-JA258, JA261, JA263; JA068; JA076, at JA081: JA115, at JA121 and JA132.) Yet Ms. Wille left the December 14th bargaining session understanding that the parties had reached a resolution and that Mike-sell's was free to implement on January 1st. She therefore did not pursue the reopener process any further, despite being ready and willing to move ahead and having previously informed the Union of her intent to do so. (JA311.) The history of the parties' relationship provides critical background for understanding the importance of the parties' communications before, during, and after the December 14th bargaining session.

**B.     The Parties' Practice Of Not Entering Written Agreements On Mid-Term Bargaining Issues Demonstrates Why They Did Not Put The 2011 Reopener Agreement In Writing.**

The ALJ places great emphasis on the fact that the parties did not sign a written agreement related to the proposed health and welfare changes. (JA007; ALJD, pp. 5, 6.)  The mere fact that the parties' December 14th agreement was never placed in writing is ***not*** dispositive.  While the technical rules of contract law are not always controlling in labor relations negotiations, the normal rules of offer and acceptance are applicable to determine whether an agreement was reached.  An offer can be accepted, and the parties bound, without the agreement being reduced to writing and signed.  *Kasser Distiller Products*, 307 NLRB 899, 903 (1992).  Section 8(d) of the NLRA only requires that parties bargain in good faith and execute "a written contract incorporating any agreement reached ***if requested by either party***."  29 U.S.C. § 158(d) (emphasis added).  Thus, the Board has found verbal agreements to be enforceable even where there is no demonstrated practice of not putting agreements in writing.  *See, e.g., Safeway Steel Products*, 333 NLRB 394, 400 (2001) (recognizing that the surrounding circumstances of a negotiations sessions, which ended with a handshake on the deal, established an "explicit, forthright demonstration of acceptance and approval," despite the lack of a signed writing); *International Brotherhood of Electrical Workers, Local Union No. 22*, 268 NLRB 760, 762 (1984) (finding that verbal assent was sufficient to bind local

union even where union's constitution and bylaws required approval from the international division, as the local union placed no caveat or reservation on its verbal assent that approval from its international division would be necessary).

In this case, when the parties have engaged in regular bargaining for a successor agreement, they have followed a traditional practice of placing tentative agreements in writing and having Union members vote on them.  (*See, e.g.,* JA170-JA175, JA292-JA294; JA089; JA090; JA092; JA093.)  But the Labor Agreement does ***not*** have an integration clause, and when the parties have engaged in mid-term bargaining, they do ***not*** have a practice of reducing their agreements to writing or putting their agreements to a vote by the Union membership.  (JA274, JA278; *see generally* JA036.)  As explained in the Statement of Facts, there are several agreements between the Union and the Company that were bargained mid-term, that are not in writing, and that directly contradict substantive provisions of the Labor Agreement.  (JA278, JA284-JA291.)

If the parties had wanted to preclude verbal modifications of the Labor Agreement, they could have negotiated an integration clause.  Such clauses typically state that the written contract integrates the parties' "entire agreement" and may not be amended except through a writing signed by both parties.  *See, e.g.,* Elkouri & Elkouri, *How Arbitration Works* § 12.7 pp. 620-21 (6th Ed. 2003) (citing cases); *see also Baldwin-Whitehall School District*, 129 LA 899, 908-09

(Kobell, March 21, 2011) (discussing effect of integration clauses); *Township of Robinson*, 109 LA 995, 999 (Dean, Jr., October 6, 1997) (same). But the Labor Agreement in this case contains no integration clause, and the parties have a long history of coming to unwritten agreements on mid-term bargaining issues in which the agreed-upon changes are directly contrary to express provisions of the Labor Agreement. It is undisputed that unwritten, mid-term agreements have been reached on both economic issues and noneconomic issues. (JA222-JA225, JA278-JA291; JA137.) Hence, the lack of a written agreement does not support the ALJ's Decision. Rather, it simply demonstrates consistency with the parties' course of dealing for mid-term issues.

### C.     The Results Of The 2008 Reopener Reveal The Motive For The Union's Delay Tactics During The 2011 Reopener.

Although the ALJ generally recognized the year-long delay in the 2008 reopener (JA007; ALJD, pp. 3, 5; JA244), he did not properly consider its overall import as the cause for the Company's diligence—and the Union's delay—during the 2011 reopener. Mike-sell's knew well that the contractual reopener process would have to be exhausted—or resolved by mutual agreement—before the proposed health and welfare changes could be implemented. (JA250-JA251, JA311-JA313.) Mike-sell's also knew from experience with the 2008 reopener that, if the Company did not insist on strict adherence to the contractual reopener timelines, the Union may draw the process out over the course of a year. (JA244,

JA310.)  Mike-sell's was therefore determined to strictly follow the contractual timelines for the 2011 reopener because it wanted to implement the proposed changes within a short period of time (i.e., as close to January 1, 2012, as possible). Ms. Wille did everything in her power to move the reopener process along in accordance with contractual timelines, and she would have continued with the reopener process had the parties not reached an agreement on December 14th. (JA311.)

The Union knew what was likely to happen if Mike-sell's succeeded in pursuing its proposals through the entire reopener process, as the Union remembered all too well losing at arbitration during the 2008 reopener.  The Union knew that it did not have the luxury of a year-long delay this time, as Mike-sell's was diligently pursuing the contractual timelines, which set a 60-day window for the entire reopener process.  (JA036, at JA053.)

The ALJ hastily recognized that the parties engaged in "extensive, rapid-fire correspondence."  (JA007; ALJD, p. 6.)  But the ALJ failed to recognize that all of this correspondence was initiated and continued by Mike-sell's in an effort to comply with each step of the reopener process, which would have continued had the Union not conceded to the Company's proposal during the December 14th bargaining session.  (JA115; JA311.)  Indeed, the ALJ recognized that Ms. Wille

- 29 -

had previously informed the Union of her intention to proceed to binding arbitration if no agreement was reached. (JA007; ALJD, p. 4.)

In contrast, the Union's actions before, during, and after the December 14th bargaining session reflect an attempt to avoid and delay the contractual reopener process at every juncture. For example, Mr. Newsome failed to provide a bargaining date within ten days from the date that negotiations were reopened;[15] demanded that negotiations take place 90 minutes away from the parties' normal meeting location; refused to participate in the mediation process, despite his previously-announced availability on the scheduled mediation date; refused to select an arbitrator even after specifically suggesting (by and through counsel) that Mike-sell's request an FMCS arbitration panel; and waited until early December 2011 to claim for the first time that Mike-sell's had reopened negotiations prematurely. (JA185-JA189, JA258-JA259, JA263-JA264; JA075; JA076, at JA078-JA081.) In addition, while Mr. Newsome testified that he told Ms. Wille at the December 14th bargaining session that the parties would "let an arbitrator make the decision," the Union never followed up to pursue mediation or to

---

[15] This is true whether the reopener notice date is considered as of November 8th (i.e., the one-week premature date on which the reopener notice was first sent) or November 15th (i.e., the third request from the Company to reopen which was timely sent on the one-year anniversary of the Labor Agreement's execution date), as Mr. Newsome offered no bargaining dates until November 29th. (JA062; JA064; JA065; JA066; JA115, at JA117-JA119.)

participate in the arbitrator selection process within the contractual timelines. (JA176-JA177, JA194.)

The Union's continual delay tactics in November and December reflect an obvious attempt to avoid the contractual reopener process altogether, as the ultimate outcome had not been favorable in 2008.  (JA252-JA277; JA115, at JA116, JA119, JA122, JA124, JA128-JA132.)   The Union realized that the only way to delay the proposed health and welfare changes in 2011 was to delay the contractual progression to arbitration.  Of course, the Union could not flat out refuse to participate in the contractual process, or it would face an unfair labor practice charge itself.  But the Union *could* give "lip service" to the contractual process by bargaining with the Company and reaching a verbal agreement on the proposals, which the Union knew would not be put in writing based on the party's mid-term bargaining practices.  The Union also knew that, if it made verbal concessions at the bargaining table, then Mike-sell's would believe that the parties had reached agreement and would have no reason to push the reopener process forward.  If Mike-sell's went to implement on January 1, 2012, the Union could simply deny the existence of an agreement based on the lack of a signed writing and either argue (1) that the Company was now outside the contractual timelines, so the timelines had been waived; or (2) that the Company must continue to follow the contractual process to arbitration.  And if Mike-sell's actually implemented the

changes based on the verbal agreement on December 14th, the Union knew that it could simply file an unfair labor practice charge, denying the concessions made at the table and forcing the Company to restart the reopener process.  In any scenario, the Union could successfully delay the proposed changes beyond the 60-day window set by the Labor Agreement.

### D.     The December 12th Informational Meeting Reveals Important Discrepancies In The Union's Testimony.

The ALJ discounts the importance of the December 12th informational meeting with the Union, where the Company's proposed healthcare changes were explained by an insurance representative.  (JA007; ALJD, p. 4.)  However, the Union's testimony about this meeting calls its credibility into question.  Mr. Campbell and Mr. Christopher Clark, a Union member and witness, both testified that Ms. Wille presented the health and welfare proposals during the December 12th meeting as a foregone conclusion, as if the Company had already made the decision to implement the changes for the Union on January 1, 2012.[16]  (JA207, JA233.)  Logic dictates that, if Mike-sell's had actually presented the proposals to the Union as a foregone conclusion and had mentioned nothing about bargaining, then Union members (particularly the Union Steward) would have raised questions

---

[16] The ALJ, in his Decision, also makes the broad finding that, "[i]n 2011, [Mike-sell's] decided to make reductions to employees' benefits."  (JA007; ALJD, p. 3.) To the extent that this finding conveys that Mike-sell's never intended to bargain with the Union over the proposed changes to bargaining unit members' health and welfare benefits, it is directly contrary to the undisputed evidence in the record.

or concerns at the informational meeting, yet none were raised.  (JA207, JA219, JA234.)  The Union's testimony does not fit with the surrounding circumstances.

Evidence regarding the December 12th informational meeting is also important because it reveals inconsistencies in the Union's testimony.  Mr. Clark denied that Ms. Wille referenced her upcoming bargaining session with the Union at the December 12th informational meeting, suggesting that he had no idea that Mike-sell's would be talking with the Union at all.  (JA233-JA234.)  This testimony was flatly contradicted by both Ms. Wille and Mr. Campbell, each of whom explained that Ms. Wille did indeed disclose that she would be meeting with the Union about the proposed changes.  (*Compare* JA233-JA234 *with* JA207, JA251, JA303.)  Mr. Campbell further confirmed that, **even before the informational meeting**, he had informed Union members "what was going on" and that the Union and the Company "were going to have a meeting about the insurance" so that "everybody was on the same page."  (JA209.)

### E.    The Union's Demand To Bargain Outside The Contractual Timelines Demonstrates That Both Parties Had The Obligation To Push The Contractual Reopener Process Forward.

Mr. Newsome testified—and the ALJ held—that Mike-sell's had the exclusive obligation to push the contractual reopener process forward from step to step if no agreement was reached.  (JA007; ALJD, pp. 6-7; JA177, JA201.)  However, the Labor Agreement does not identify any particular party as being

exclusively responsible for moving the process forward.  (JA036, at JA053.)  In fact, the Labor Agreement specifically refers to "the request of ***either party*** for binding arbitration," which does ***not*** reflect an intent to place the onus of requesting arbitration on the party who requested the reopener.  (JA036, at JA053 (emphasis added).)  Furthermore, if Mike-sell's had sole responsibility for moving the reopener process forward, then the Union would not have sent a letter on January 13, 2012, attempting to submit the matter to the mediation.  (JA095.)  Rather, based on the strict constructionist attitude that the Union had adopted thus far,[17] it seems much more likely that the Union would have claimed that Mike-sell's had waived the right to move to the next step in the reopener process because the Company did not request mediation within ten days of the parties' bargaining session, thereby forcing the Company to begin the reopener timeline all over again and buying even more time for Union members.  It makes no sense that the Union would suddenly take initiative to attempt to move the reopener process along, if it truly had no obligation to do so.

If the ALJ had properly considered these aspects of the parties' bargaining history and practices, then he would have concluded that the parties reached an agreement on December 14th, and thus, no unfair labor practice was committed through the Company's implementation on January 1, 2012.

---

[17] On December 2, 2011, the Union claimed that the Company's notice to reopen negotiations was "void" because it was served seven days prior to the one-year anniversary of the Labor Agreement's execution date.  (JA160; JA076, at JA079-JA080; JA115, at JA130-JA131.)

## II.    The ALJ Abused His Discretion In Making Credibility Determinations.

### A.    The Union's Inconsistent Testimony Demonstrates That Its Position Is Unworthy Of Credence.

The ALJ either ignored or hastily discounted several inconsistencies between the testimony of Union witnesses.  In addition to the inconsistencies between Mr. Clark's testimony and Mr. Campbell's testimony as explained in Section I(D) of the Argument, the Union's testimony about its overall bargaining stance on the proposed health and welfare changes is also inconsistent, as are the ALJ's findings in that regard.

Mr. Campbell adamantly testified—and the ALJ found—that the Union had already decided, "[b]efore entering the December 14 session," that it would not agree to <u>any</u> change whatsoever "unless it was going to be for the better."  (JA007; ALJD, p. 4; JA204, JA210.)  Mr. Campbell thus did not testify that the Union raised any alternative proposals during the December 14th bargaining session. (JA208-JA210.)  In contrast, Mr. Newsome testified—and the ALJ found—that the Union proposed "a number of alternatives" during the December 14th bargaining session, such as implementing a smaller reduction in HSA contributions or postponing the changes until June 2012, the latter of which Mr. Campbell specifically denied being discussed.  (JA007; ALJD, pp. 4-5; *compare* JA163-JA164 *with* JA210.)  Either of Mr. Newsome's proposed alternatives would obviously result in some reduction to health and welfare benefits, which would not

- 35 -

be consistent with Mr. Campbell's emphatic stance of only accepting a "change for the better." The ALJ gave no explanation for how he reconciled these inconsistencies, which dealt with the heart of the parties' negotiations rather than some collateral matter.

The ALJ also ignored or discounted other differences in the testimony of Mr. Newsome and Mr. Campbell. For example, Mr. Newsome denied that Ms. Wille ended the bargaining session by stating that the changes would be implemented for the Union on January 1st, whereas Mr. Campbell admitted that Ms. Wille had announced as much—an important contradiction in testimony that the ALJ either did not catch or blatantly ignored. (JA007; ALJD, p. 5; *compare* JA192 *with* JA220, JA222.) Also, Mr. Newsome claimed that the agreement to pay Maintenance Mechanics at a rate higher than in the Labor Agreement is reflected in a "letter" signed by both the Company and the Union, yet he failed to bring a copy of this purported "letter" to the hearing,[18] and Mr. Campbell later confirmed that this pay raise was indeed based on a purely verbal agreement. (JA007; ALJD, p. 6; *compare* JA195-JA199 *with* JA224-JA226.) These compounding

---

[18] Mr. Newsome provided examples of several written agreements for successor contracts to the General Counsel for use at the hearing, yet he failed to provide the purported "letter" dealing with the extra-contractual Maintenance Mechanic's pay increase. (JA169-JA170, JA174, JA195-JA199; JA089; JA092.) Notably, the General Counsel produced **no** examples of written agreements reached on ***mid-term*** bargaining issues.

inconsistencies belie the ALJ's conclusion that the Union's witnesses were credible and corroborative.

**B.     Ms. Wille's Demeanor And Testimony Were Consistent With The Evidence Of The Parties' Bargaining History And Practices.**

The ALJ improperly found that Ms. Wille's account was "implausible in the extreme" and that  Ms. Wille "was a less than fully credible witness based on her demeanor and testimony as [a] whole."  (JA007; ALJD, p. 6.)  The ALJ criticizes Ms. Wille's testimony because it was not corroborated (JA007; ALJD, p. 4), whereas the General Counsel called three Union witnesses and introduced notes to corroborate Mr. Newsome's testimony (JA007; ALJD, pp. 6-7).  However, there is no principle of law applicable to Board proceedings that requires the testimony of interested witnesses to be ignored or rejected simply because of the absence of corroboration.  *See, e.g., In re Skippy Enterprises, Inc.,* 211 NLRB 222, 225 (1974).

In any case, Ms. Wille did, in fact, introduce corroborating evidence of the December 14th bargaining session in the form of her personal notes taken during the regular course of business to document the meeting.  (JA270-JA271; JA143.)  The ALJ decided that Ms. Wille's notes were "less reliable" than Mr. Newsome's notes based on the fact that Ms. Wille could not recall whether she had taken all of the notes at the meeting itself or whether she made some notes after the meeting.  (JA007; ALJD, p. 7; JA272-JA273.)   It appears that, in making this credibility

- 37 -

determination, the ALJ has confused and/or merged the "present sense impression" hearsay exception (which requires that the out-of-court statement be made "***while the declarant was perceiving the event or condition, or immediately thereafter***") with the "business records" hearsay exception (which requires only that the record be made "***at or near the time [of the event]***").  (*Compare* Federal Rule of Evidence 803(1) *with* Federal Rule of Evidence 803(6).)  Ms. Wille testified that, while all her notes were made the same day as the bargaining session, some notes may have been made at the bargaining session itself while others may have been made shortly thereafter.  (JA272-JA273.)  This comports perfectly with the "business records" exception, which means that Ms. Wille's notes are just as reliable as Mr. Newsome's notes.

The ALJ evaluated Ms. Wille's "demeanor" based on the fact that (1) she "had no direct knowledge regarding the circumstances of [certain unwritten, midterm agreements between the parties];" and (2) she "gave the impression of being extremely impatient to see the health care changes implemented" based on her "premature filing of the reopening notice and her insistence on going ahead with a date for federal mediation even after Newsome stated that the Union could not be present on that day."  (JA007; ALJD, p. 6.)  The ALJ's findings regarding Ms. Wille's demeanor are based on evidence that was misconstrued and taken out of context.

As to the unwritten agreements, Ms. Wille had worked for Mike-sell's for over six years at the time of the hearing, and she has personal knowledge of existing unwritten agreements, despite the fact that some were entered prior to her tenure.  (JA278, JA284-JA291.)  Her knowledge is based on the fact that, during the course of her employment, she noticed that certain things were not being done according to the terms of the Labor Agreement.  (JA296.)  Like any responsible human resources manager, Ms. Wille inquired as to *why* the Labor Agreement was not being followed the way it was written.  (JA295-JA296.)  Through her inquiries, Ms. Wille gained "institutional knowledge" from Company officials, who informed her of various unwritten, mid-term agreements that had been negotiated between the parties.  (JA295-JA297.)  Ms. Wille needed to know whether the deviations were simply a past practice (which can easily be discontinued when the practice is in direct conflict with the Labor Agreement) or whether the deviations were bargained-for changes that were never put in writing (which cannot be changed without further bargaining).  Given that Ms. Wille needed to know the status of these existing contract deviations to determine whether they were legally required to continue, it is entirely reasonable that she would seek out accurate historical information.  The fact that Mike-sell's has admitted to the existence of these unwritten agreements—all of which were proposed by the Union, *not* the Company—further demonstrates Ms. Wille's credibility.  After all, Mike-sell's has

- 39 -

nothing to gain by providing sworn testimony regarding the existence of unwritten agreements—favorable to the Union—that serve to bind and restrict the Company from following the terms of the Labor Agreement as written.

As to the premature reopener filing, there is no evidence that Ms. Wille intended to "jump the gun" by deliberately filing the notice to reopen a week early. It is easy to see how such a mistake was made. The effective date of the Labor Agreement is printed conspicuously on the cover of the Labor Agreement itself, which is the date that Ms. Wille consulted before issuing the notice. (JA036.) The execution date of the Labor Agreement happened to occur several months after the effective date, and the execution date is not printed in bold on the cover of the Labor Agreement. Ms. Wille simply made a mistake in serving the notice a week early, based on the effective date (rather than the execution date) of the Labor Agreement. This mistake does not demonstrate "extreme impatience" or an incredible demeanor.[19]

As for the mediation, Ms. Wille chose November 29, 2011, as a mediation date because that was the date that Mr. Newsome had specifically stated he could be available. (JA151-JA152, JA255-JA256, JA258; JA066, JA115, at JA119.) It was not unreasonable for Ms. Wille to rely on Mr. Newsome's representations of

---

[19] To the extent that Mike-sell's was faulted for the premature reopener notice, the Union should have also been faulted for waiting over three weeks to object to this procedural flaw. (JA076; JA115, at JA130-JA131.)

availability at the time the mediation was scheduled. It was also not unreasonable for Ms. Wille to keep the mediation on the calendar even after Mr. Newsome claimed that he had suddenly become unavailable, as Ms. Wille reasonably expected Mr. Newsome to reschedule whatever he had scheduled in the meantime in order to honor his commitment to be available for the reopener. Ms. Wille's actions do not demonstrate "extreme impatience" or an incredible demeanor, as found by the ALJ. Rather, they reflect those of a party who is diligently endeavoring in good faith to comply with contractual timelines, despite the Union's attempts to delay the reopener process.

Furthermore, Ms. Wille was forthright and steadfast in her testimony, and she gave a consistent and detailed explanation of events. (JA237-JA313.) The General Counsel elicited nothing during Ms. Wille's cross examination that would suggest she was not telling the truth about what occurred before, during, or after the December 14th bargaining session. Moreover, Ms. Wille's actions before, during, and after the bargaining session are consistent with those of a party who is determined to comply with the contractual reopener process and who would have aggressively continued pursuit of that process if no agreement had been reached.[20]

---

[20] The ALJ focused on the fact that, at one point, Ms. Wille may have confused the Union's Labor Agreement terms with those of other bargaining units whose contracts allow unilateral modifications of healthcare benefits. (JA007; ALJD, pp. 5-6.) While Ms. Wille may have suffered from a moment of confusion at the hearing, it was of no consequence. Ms. Wille was clearly aware of the contractual

Even the ALJ found that Ms. Wille expressly informed the Union of her intention to proceed to binding arbitration, if an agreement was not reached in negotiations or mediation.  (JA007; ALJD, p. 4.)

In contrast, Mr. Newsome and Mr. Campbell were ***not*** credible witnesses. Mr. Newsome's testimony was directly inconsistent with Mr. Campbell's testimony on several points, as explained in Argument Section II(A) above.  Their testimony was self-serving and vague,[21] and their demeanor on cross examination was evasive and defensive.  It is clear that neither Mr. Newsome's testimony nor Mr. Campbell's testimony is nearly as complete or as detailed as Mr. Wille's testimony regarding the December 14th bargaining session.  (*Compare* JA162-JA166, JA167-JA168, JA209-JA210, JA220-JA222 *with* JA265-JA269, JA273-

---

reopener process, as she had made great efforts to follow it.  She knew that process required the Company either to bargain with the Union until agreement or to obtain a favorable arbitration decision before implementing any changes.  (JA250-JA251, JA311-JA313.)    She also knew the difference between the Union's Labor Agreement and other bargaining unit contracts, which is why she did ***not*** serve the Union with the same letter as the other unions in November 2011.  (JA007; ALJD, p. 4; JA250-JA251, JA312; JA109-JA112.)

[21] When asked whether he was sure what was said at the December 14th bargaining session, Mr. Newsome admitted he could not recall exactly what was said, but he remembered "words to that effect."  (JA193.)  Mr. Campbell also testified in a vague and evasive manner that "we both pretty much told [Ms. Wille] the same thing that people can't afford that.  They just can't, they can't afford to take that kind of cut. . . . That was it.  Like I said we spoke in a meeting and we said that we couldn't make any changes, couldn't agree to that and that, that was it. . . . [W]e just kind of just stopped and kind of said, I think both parties kind of said we'll see what happens."  (JA209-JA210.)

JA276.)  It is also plain that, while the Company's actions are consistent with its stance before, during, and after the bargaining session, the Union's avoidance tactics and strategic inaction would ***not*** be expected to follow from its purportedly emphatic disagreement with the Company's stated objectives.  Overall, the evidence does not support the ALJ's finding that the Union's witnesses were more credible than Ms. Wille.

## CONCLUSION

For the reasons stated above, the Company's Petition for Review should be granted, the General Counsel's Petition for Enforcement should be denied, and the Board's Order should be reversed because:  (I) the ALJ erred in failing to consider several important aspects of the parties' bargaining history and practices; and (II) the ALJ abused his discretion in making credibility determinations.  As a result, the record as a whole does not contain substantial evidence to support the ALJ's credibility assessments, factual findings, conclusions of law, remedy, and order.

Respectfully submitted,

*/s/     Jennifer R. Asbrock*

Jennifer R. Asbrock  (0078157)
THOMPSON HINE LLP
Austin Landing I
10050 Innovation Drive, Suite 400
Dayton, Ohio  45342-4934
Tel. (937) 443-6849
Fax. (937) 443-6635
Jennifer.Asbrock@ThompsonHine.com

*Counsel for Petitioner and Cross-Respondent, Mike-sell's Potato Chip Company*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32 because this brief contains 10,286 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1). The undersigned used Microsoft Word 2010 to compute the count.

This brief also complies with the typeface requirement of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced font using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:     November 25, 2014     */s/     Jennifer R. Asbrock*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2014, I electronically filed the foregoing Brief for Petitioner and Cross-Respondent by using its CM/ECF system, which constitutes service upon the following registered CM/ECF user(s):

Edward Swidriski
Email: Edward.Swidriski@nlrb.gov
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
1099 14th Street, NW
Washington, DC 20570-0001

Linda Dreeben, Deputy Associate General Counsel
Email: appellatecourt@nlrb.gov
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
1099 14th Street, NW
Washington, DC 20570-0001

Elizabeth Ann Heaney, Esquire, Attorney
Email: Elizabeth.Heaney@nlrb.gov
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
1099 14th Street, NW
Washington, DC 20570-0001

*Counsel for Respondent and Cross-Petitioner,*
*National Labor Relations Board*

I also served one (1) paper copy of the foregoing Brief, via FedEx, upon each of the above-referenced parties. I further certify that, pursuant to D.C. Circuit

Rules 25 and 31, eight (8) paper copies of the foregoing Brief will be hand-

delivered to the Clerk of the Court.

/s/     *Jennifer R. Asbrock*

796895.2

# STATUTORY ADDENDUM TABLE OF CONTENTS

ADDENDUM 1 - 29 U.S.C 158 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ADD-1

ADDENDUM 2 - 29 U.S.C. 160. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ADD-8

# ADDENDUM 1

## 29 U.S.C 158

§ 158. Unfair labor practices

(a) Unfair labor practices by employer. It shall be an unfair labor practice for an employer--

  (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [29 USCS § 157];

  (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 6 [29 USCS § 156], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

  (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by an action defined in section 8(a) of this Act [this subsection] as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a) [29 USCS § 159(a)], in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 9(e) [29 USCS § 159(e)] within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act;

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [29 USCS § 159(a)].

(b) Unfair labor practices by labor organization. It shall be an unfair labor practice for a labor organization or its agents--

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 [29 USCS § 157]: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

(3) to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 9(a) [29 USCS § 159(a)];

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by section 8(e) [subsec. (e) of this section];

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9 [29 USCS § 159]: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 9 [29 USCS § 159];

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:

Provided, That nothing contained in this subsection (b) shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this Act: Provided, further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;

(5) to require of employees covered by an agreement authorized under subsection (a)(3) the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected;

(6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed; and

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9(c) of this Act [29 USCS § 159(c)],

(B) where within the preceding twelve months a valid election under section 9(c) of this Act [29 USCS § 159(c)] has been conducted, or

(C) where such picketing has been conducted without a petition under section 9(c) [29 USCS § 159(c)] being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: Provided, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9(c)(1) [29 USCS § 159(c)(1)] or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: Provided further, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section 8(b) [this subsection].

(c) Expression of views without threat of reprisal or force or promise of benefit. The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.

(d) Obligation to bargain collectively. For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: Provided, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification--

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

The duties imposed upon employers, employees, and labor organizations by paragraphs (2), (3), and (4) shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 9(a) [29 USCS § 159(a)], and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. Any employee who engages in a strike within any notice period specified in this subsection, or who engages in any strike within the appropriate period specified in subsection (g) of this section, shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9, and 10 of this Act, as amended [29 USCS §§ 158, 159, 160], but such loss of status for such employee shall terminate if and when he is reemployed by such employer. Whenever the collective bargaining involves employees of a health care institution, the provisions of this section 8(d) [this subsection] shall be modified as follows:

(A) The notice of section 8(d)(1) [para. (1) of this subsection] shall be ninety days; the notice of section 8(d)(3) [para. (3) of this subsection] shall be sixty days; and the contract period of section 8(d)(4) [para. (4) of this subsection] shall be ninety days.

(B) Where the bargaining is for an initial agreement following certification or recognition, at least thirty days' notice of the existence of a dispute shall be given

by the labor organization to the agencies set forth in section 8(d)(3) [para. (3) of this subsection].

   (C) After notice is given to the Federal Mediation and Conciliation Service under either clause (A) or (B) of this sentence, the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement. The parties shall participate fully and promptly in such meetings as may be undertaken by the Service for the purpose of aiding in a settlement of the dispute.

(e) Enforceability of contract or agreement to boycott any other employer; exception. It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection (e) shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: Provided further, That for the purposes of this subsection (e) and section 8(b)(4)(B) [subsec. (b)(4)(B) of this section] the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: Provided further, That nothing in this Act shall prohibit the enforcement of any agreement which is within the foregoing exception.

(f) Agreement covering employees in the building and construction industry. It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in section 8(a) of this Act [subsec. (a) of this section] as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 9 of this

Act [29 USCS § 159] prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: Provided, That nothing in this subsection shall set aside the final proviso to section 8(a)(3) of this Act [subsec. (a)(3) of this section]: Provided further, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 9(c) or 9(e) [29 USCS § 159(c) or (e)].

(g) Notification of intention to strike or picket at any health care institution. A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention, except that in the case of bargaining for an initial agreement following certification or recognition the notice required by this subsection shall not be given until the expiration of the period specified in clause (B) of the last sentence of section 8(d) of this Act [subsec. (d) of this section]. The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of both parties.

 History:

   (July 5, 1935, ch 372, § 8, 49 Stat. 452; June 23, 1947, ch 120, Title I, § 101, 61 Stat. 140; Oct. 22, 1951, ch 534, § 1(b), 65 Stat. 601; Sept. 14, 1959, P.L. 86-257, Title II, § 201(e), Title VII, §§ 704(a)-(c), 705(a), 73 Stat. 525, 542, 545; July 26, 1974, P.L. 93-360, § 1(c)-(e), 88 Stat. 395, 396.)

# ADDENDUM 2

## 29 U.S.C. 160

§ 160.  Prevention of unfair labor practices

(a) Powers of Board generally. The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8 [29 USCS § 158]) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: Provided, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this Act [29 USCS §§ 151-158, 159-169] or has received a construction inconsistent therewith.

(b) Complaint and notice of hearing; answer; court rules of evidence inapplicable. Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to

ADD - 8

intervene in the said proceeding and to present testimony. Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States [28 USCS Appx] under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to the Act of June 19, 1934 (U. S. C., title 28, secs. 723-B, 723-C) [28 USCS § 2072].

(c) Reduction of testimony to writing; findings and orders of Board. The testimony taken by such member, agent, or agency or the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act [29 USCS §§ 151-158, 159-169]: Provided, That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him: And provided further, That in determining whether a complaint shall issue alleging a violation of section 8(a)(1) or section 8(a)(2) [29 USCS § 158(a)(1), or (2)], and in deciding such cases, the same regulations and rules of decision shall apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and order dismissing the said complaint. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. In case the evidence is presented before a member of the Board, or before an examiner or examiners [administrative law judge or judges] thereof, such member, or such examiner or examiners [judge or judges], as the case may be, shall issue and cause to be served on the parties to the proceeding a proposed report, together with a recommended order, which shall be filed with the Board, and if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the Board may

authorize, such recommended order shall become the order of the Board and become effective as therein prescribed.

(d) Modification of findings or orders prior to filing record in court. Until the record in a case shall have been filed in a court, as hereinafter provided, the Board may at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it.

(e) Petition to court for enforcement of order; proceedings; review of judgment. The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of title 28, United States Code. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to

review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

(f) Review of final order of Board on petition to court. Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any court of appeals of the United States in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28, United States Code. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

(g) Institution of court proceedings as stay of Board's order. The commencement of proceedings under subsection (e) or (f) of this section shall not, unless specifically ordered by the court, operate as a stay of the Board's order.

(h) Jurisdiction of courts unaffected by limitations prescribed in 29 USCS §§ 101-110, 113-115. When granting appropriate temporary relief or a restraining order, or making and entering a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part an order of the Board, as provided in this section, the jurisdiction of courts sitting in equity shall not be limited by the Act entitled "An Act to amend the Judicial Code and to define and limit the jurisdiction of courts sitting in equity, and for other purposes," approved March 23, 1932 (U. S. C., Supp. VII, title 29, secs. 101-115).

(i) [Repealed]

(j) Injunctions. The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging

in an unfair labor practice, to petition any district court of the United States (including the United States District Court for the District of Columbia) [United States district court], within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

(k) Hearings on jurisdictional strikes. Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 8(b) [29 USCS § 158(b)(4)(D)], the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

(l) Boycotts and strikes to force recognition of uncertified labor organizations; injunctions; notice; service of process. Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 8(b) or section 8(e) or section 8(b)(7) [29 USCS § 158(b)(4)(A), (B), or (C), or (e), or (b)(7)], the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States (including the United States District Court for the District of Columbia) [United States district court] within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: Provided further, That no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable and such temporary restraining order shall be effective for no longer than five days and will become void at the expiration of such period: Provided

ADD - 12

further, That such officer or regional attorney shall not apply for any restraining order under section 8(b)(7) [29 USCS § 158(b)(7)] if a charge against the employer under section 8(a)(2) [29 USCS § 158(a)(2)] has been filed and after the preliminary investigation, he has reasonable cause to believe that such charge is true and that a complaint should issue. Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: Provided further, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. The service of legal process upon such officer or agent shall constitute service upon the labor organization and make such organization a party to the suit. In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 8(b)(4)(D) [29 USCS § 158(b)(4)(D)].

(m) Priority of cases. Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of subsection (a)(3) or (b)(2) of section 8 [29 USCS § 158(a)(3) or (b)(2)], such charge shall be given priority over all other cases except cases of like character in the office where it is filed or to which it is referred and cases given priority under subsection (l).

 History:

(July 5, 1935, ch 372, § 10, 49 Stat. 453; June 23, 1947, ch 120, Title I, § 101, 61 Stat. 146; June 25, 1948, ch 646, § 32(a), (b), 62 Stat. 991; May 24, 1949, ch 139, § 127, 63 Stat. 107; Aug. 28, 1958, P.L. 85-791, § 13, 72 Stat. 945; Sept. 14, 1959, P.L. 86-257, Title VII, §§ 704(d), 706, 73 Stat. 544, 545; Nov. 8, 1984, P.L. 98-620, Title IV, Subtitle A, § 402(31), 98 Stat. 3360.)